### BODIN et ux. v. TEXAS CO. et al.

### No. 1921.

Court of Appeal of Louisiana. First Circuit.

Feb. 15, 1939.

Walter J. Burke and James Simon, both of New Iberia, for appellants.

James L. Helm, of New Iberia, for appellees.

OTT, Judge.

The seven year old son of plaintiffs was run over by a truck belonging to The Texas Company in the City of New Iberia on October 1, 1937, and as a result of the injury received by the child in the accident, it died nineteen days later. The parents bring this suit against the owner of the truck and its insurance carrier, the Maryland Casualty Company, for damages in the sum of $17,000, and the father brings a suit against the two defendants for the sum of $629.08 for expenses incurred by him on account of the injury and death of the child.

The trial court rendered judgment in favor of the parents for the death of the child in the sum of $13,500, and in favor of the father for the amount claimed by him on account of the expenses incurred. The defendants have appealed.

The unfortunate accident happened on Bridge Street, some 87 feet from its intersection with Main Street, in the City of New Iberia. While Bridge Street does not run exactly north and south, yet for the purpose of discussing the case, we will use these directions for convenience. Main Street runs east and west and is the principal thoroughfare of the City. There is a stop light at the intersection of the two streets. At the time of the accident, the truck was being driven by Emile Vuillemot, an employee of The Texas Company, and acting within the scope of his employment. Bridge Street is 29½ feet wide from curb to curb, and appears to be a street with considerable traffic.

On the west side of Bridge Street there is a store building extending from the side walk at the intersection north along bridge street for more than a hundred feet. Between the curb and the side walk—that is on the neutral ground—there is a telephone post 33 feet north of the intersection, and a distance of 59 feet from the intersection there is an entrance from the street to the store building. The boy started across Bridge Street from this entrance and traveled in a northeasterly direction, that is diagonally across the street at an angle of about 45 degrees. The boy ran into or was struck by the truck at a point which the preponderance of the evidence shows to be about 87 feet from the intersection and some 10 or 12 feet from the east curb. The child struck the truck on its left side, back of the cab, and the rear wheels of the truck ran over and mangled the legs of the boy producing the injury from which he died.

The driver of the truck, coming east on Main Street, made a left turn into Bridge Street and was traveling north on Bridge Street on his right hand side, some four or five feet from the east curb—one of the witnesses places the truck as close as 1½ to 2 feet of the east curb, while the driver himself says that he was traveling from 5 to 7 feet of the east curb. But taking into consideration all the other evidence on this point, we do not think that we are far wrong in saying that the truck was traveling four or five feet from the east curb. As to the speed of the truck, it is estimated as low as 7 or 8 miles per hour to as high as 12 to 15 miles per hour. We feel safe in fixing the speed of the truck at about 10

miles per hour, which, of course, is not an unreasonable speed.

The principal acts of negligence charged against the truck driver are as follows: That he cut the corner at the stop light in making the left turn; that he failed to give any signal in making the left turn into Bridge Street, and exceeded the speed limit while making the turn; that he failed to keep a proper lookout and observe the way ahead, and failed to stop the truck in time to avoid the accident, which he could have done had he been attentive to his duties and observant of the situation with which he was confronted.

All of the allegations of negligence are denied by the defendants, and they aver that the cause of the accident was the sudden and unexpected act of the child in running out from behind parked or stopped cars into the side of the truck, and that the truck driver was not able to see and did not see the child in time to stop the truck and avoid the accident.

Defendants filed a plea of contributory negligence on the part of the deceased boy, but this plea has been abandoned, as counsel recognize that, under the jurisprudence of this state, a seven year old child is not capable, from a legal standpoint, of being charged with contributory negligence. The question is therefore narrowed down to the one of whether or not the truck driver was guilty of any act of negligence that contributed to the injury of the child; whether or not the truck driver had the last clear chance to avoid the accident, or whether or not the accident was an unavoidable one.

While the truck driver admits that he cut the corner in making the left turn into Bridge Street, which seems to be a violation of an ordinance of the City, yet we doubt if this act on his part can be said to be a proximate cause of the accident that followed after he had made the turn and had gotten completely over on his side of the street. In fact it appears to us that whatever acts of negligence the truck driver might have been guilty of while making the left turn, were too remote to be classed as a proximate cause of the accident. Of course, it is reasonable to assume that, if the truck driver had not made the turn shorter by cutting the corner, he would have had a greater distance to go to the point of the accident and more than likely the child would have passed before he reached the point. However, to carry this supposition to its reasonable conclusion, it would not be very difficult to find some antecedent act, remote in time and in space, that could be designated as a proximate cause of an accident by indulging the assumption that the accident would not have happened had the person not committed the antecedent act. The negligence charged to the person sought to be held liable must be the proximate cause, and not the remote or indirect cause, of the accident.

In determining whether or not the truck driver was guilty of any act of negligence that contributed to the injury and death of the child, we think his acts must be judged from the time that he made the left turn into Bridge Street until the child was struck. As stated before, he was traveling on his right side of that street from the time he made the turn until the accident occurred, and he was traveling at a reasonable rate of speed. Therefore, his acts of negligence, if any, consisted in his failure to keep a proper lookout and in his failure to stop the truck in time to avoid the accident, regardless of the negligent acts of the child.

The truck driver says that he could stop the truck within three feet going at the speed of ten miles per hour. But as that seems a rather short distance in which to stop a truck traveling at that speed, we will say he could have stopped the truck within four or five feet after seeing the child. Just when he first saw the child, or should have seen it coming toward the truck, becomes a very vital and determining question in the case.

The preponderance of the evidence shows that there were two or three parked or stopped cars on the west side of Bridge Street between the intersection and the point of the accident. A telephone truck was parked by the telephone post, 33 feet from the intersection, but the evidence is not certain as to where the other cars were parked, or just how many were parked on the west side of Bridge Street. Some of the witnesses content themselves with saying that cars were parked on that side of the street; one witness says that only the telephone truck was parked on that side of the street, and another witness gives the number as two or three cars.

It is obvious that, whatever the number of cars parked on the west side of the street, these cars could not have been very close together and did not entirely cut off the view from that side of the street. As-

suming that there were as many as four cars parked within this distance of eighty or ninety feet from the intersection to a point opposite where the accident happened, unless some of the cars were very close together, there was considerable space between the cars. There were no cars parked on the east side of the street.

We cannot say from the evidence that there were any cars moving in the traffic lanes either from or toward Main Street, other than one car which passed the oil truck of the Texas Company about opposite the telephone post. If another car had stopped for the red light at the intersection, as indicated by the evidence, neither of these cars would have obstructed the view of the truck driver after he passed the point opposite the telephone post. It is true that there was another telephone truck coming south toward Main Street facing the driver of the oil truck, but this telephone truck was too far out Bridge Street to affect the view of the driver of the oil truck just before the accident happened.

The boy started across the street about 59 feet north of the intersection, traveling from the west side diagonally toward the northeast across the street. The preponderance of the evidence is to the effect that the truck had just turned the corner into Bridge Street when the boy started across. Some of the witnesses say the boy ran across the street; others say he went in a fast walk or a kind of trot, while one witness says he started across in a fast walk, and then started running after he had gotten out into the street. In any event, we think it is safe to say that the boy was traveling faster than a fast walk, but not as fast as he could run. That being true, he must have been going about five miles per hour, or about half as fast as the truck was traveling. From the point where the boy started across the street to where he was struck is a distance of about 35 feet. As the truck was going about twice as fast as the boy, it must have traveled at least twice as far as the boy did after he started across the street. The boy and the truck were converging at an angle of about 45 degrees, the boy going some 35 feet and the truck going twice that distance, or more. If the truck was completely turned in Bridge Street when the boy started across, the center of the truck was some 75 to 80 feet from the point of the accident at that time.

Now, bearing in mind that the truck driver could have stopped the truck within five feet at the rate he was then traveling, the question arises, for how great a distance could the boy have been seen as he was converging toward the truck in the manner above stated? Assuming that the boy came from behind a parked car, and that he could not be seen until he had cleared the car (an assumption most favorable to the defendants and not justified by the evidence), still there was nothing to prevent the driver of the truck from seeing the boy after he cleared the parked car. The parked car (if there was such present) hardly extended more than eight feet out into the street. As the boy came from behind the parked car, the truck must have been somewhere near a point opposite the telephone post, passed or about to pass the car going toward Main Street. After passing this car, and after the boy had gotten eight or ten feet out into the street, there was nothing to prevent the truck driver from seeing him.

Indeed, several witnesses—both for plaintiffs and for defendants—could see and did see the boy after he had gotten out into the street. Roddy, a witness for defendants, testified that he saw the boy come from behind some parked cars and run across the street before the truck struck the boy. Roddy was standing on the south side of Main Street at the intersection and had a clear view out Bridge Street from the rear of the truck and in the direction the truck was traveling. Broussard, also a witness for defendants, was coming toward Main Street, meeting the truck, and he saw the boy crossing the street before he was struck. St. Martin, a witness for the plaintiffs, says that when the boy was about ten feet out into the street that the truck was then 25 or 30 feet from the intersection, and that there was nothing to keep the truck driver from seeing the boy after he had gotten ten feet out into the street. Louis Breaux, a witness for plaintiffs, says that, after the truck had gotten about thirty feet from the intersection, there was nothing to prevent the driver from seeing the boy in the street.

The left side of the truck—the side on which the driver was sitting—was ten or twelve feet from the east curb. After the boy had gone ten feet or so from the west curb, there was still a distance of eight or ten feet between him and the left

side of the truck, had the truck at the time been opposite him. But the truck had not then reached a point opposite the boy, and the boy was not going directly across the street. With the truck several feet back toward Main Street, and the boy traveling partly in the same direction of the truck (converging with it at an angle of about 45 degrees) the distance between the driver and the boy was extended several feet, with the boy in front and to the left of the driver as they converged. There was sufficient distance traveled by the boy while he could have been seen by the truck driver, not only to enable the truck driver to stop, but sufficient to permit him to stop two or three times, had he been keeping a proper lookout. The truck driver says that he did not see the boy at all until he ran into the side of the truck. Under the situation as it existed, and in view of the fact that several of the witnesses saw the boy running in the street before he ran into the truck, we are unable to understand why the truck driver did not see the boy in time to stop. Not only was the truck driver under a greater duty to be watching for pedestrians on the street than these witnesses who were only casual by-standers, but he had a much better opportunity of seeing the boy than these witnesses from his vantage point in the cab of the truck on the same side of the street from which the boy approached.

Much evidence was introduced, and considerable argument advanced in the briefs, to show that the truck driver had his head turned to his left and was waving at a friend on the corner just before and at the time of the accident. The driver admits that he waved at a friend at the corner as he made the turn into Bridge Street, but he denies that he looked to his left or waved his hand after he made the turn. The driver of the car who passed the truck near the telephone post testified that as his car and the truck passed at this point, the truck driver had his head turned toward the left waving to a lady on the corner. A nine year old boy testified that he saw the truck driver look to his left and wave to a friend as he turned the corner, and that the truck driver kept waving until the truck hit the boy.

■ This evidence is important only as it tends to give a reason for the failure of the truck driver to see the boy running across the street. We do not deem it necessary to decide whether or not the truck driver was waving and had his head turned to the left when his truck struck the boy. However, we do believe, as did the trial judge, that the truck driver was waving to a friend and had his head turned to the left as he passed the point opposite the telephone post, almost half the distance from the intersection to the point of the accident. Suffice it to say that the record shows that the truck driver did not see what he was required to see, and it is not incumbent on the plaintiffs to show why he did not discharge his duty in this particular instance. The duty of the truck driver, and his failure to discharge that duty, is well summed up in the recent case of Jackson v. Cook, 189 La. 860, 181 So. 195, the pertinent part of that decision being condensed in the syllabus as follows: "The duty of those in charge of automobiles to look ahead and observe never ceases, and in legal contemplation what they can see they do see, and the failure to see that which could have been seen by the exercise of due diligence does not absolve the motorist from liability." Numerous cases have been cited by counsel on both sides as having some application to the present case. Selecting those cases where the child was struck on the side of the truck or automobile, we think the following three cases are most appropriate to the present case and tend to support our findings and conclusion in this case; viz., Burvant et ux. v. Wolfe, 126 La. 787, 52 So. 1025, 29 L.R.A., N.S., 677; Guillory v. Horecky et al., 185 La. 21, 168 So. 481, and Moreau v. Southern Bell Telephone & Tel. Company, La. App., 158 So. 412.

■ While we agree with the trial judge as to the liability of the defendants, we disagree with him in the amount awarded the parents for the death of their child. An examination of several cases shows that there is no fixed value placed on a child; the value of a human life cannot be valued in dollars and cents. In every case, there are present factors to be considered that do not always appear in other cases, or if they do appear, they are different in nature and require a different evaluation. Awards to both parents for the death of a child usually range from four thousand dollars to ten thousand dollars. We think an award in this case of $6000 to both parents for the death of the child plus the sum of $1000 for pain and suffering sustained by the child, a total of $7000, would be proper and in line with the awards made in other similar cases.

The amount awarded the father for expenses seems to be fully justified by the evidence and is not questioned by the defendants.

For the reasons assigned, the judgment appealed from is amended by reducing the amount awarded the plaintiffs for the death of their child from $13500 to the sum of $7000, and as thus amended, the judgment is affirmed; plaintiffs to pay the cost of the appeal, and the defendants to pay all other cost.